<u>**CLOSING**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| _____ | : | |
| MARS, INC., and MARS | : | |
| ELECTRONICS | : | |
| INTERNATIONAL, INC., | : | |
| | : | |
|     Plaintiffs and | : | CIVIL ACTION NO.: 90-0049 (JCL) |
|     Counterclaim Defendants: | | |
|   v. | : | **OPINION RE: PREJUDGMENT** |
| | : | **INTEREST ON INFRINGEMENT** |
| COIN ACCEPTORS, INC. | : | **DAMAGES** |
| | : | |
|     Defendant, and | : | |
|     Counterclaimant. | : | |
| _____ | : | |

**<u>LIFLAND, District Judge</u>**

I.    **<u>Background</u>**

    On April 20, 2007, the Court ruled that under 35 U.S.C. § 284, Plaintiff

Mars, Inc. ("Mars") is entitled to $14,376,062.00 in damages for Defendant Coin

Acceptors, Inc.'s ("Coinco") infringement of Mars' U.S. Patent Nos. 3,870,137

("the '137 patent"), and 4,538,719 ("the '719 patent").  Had Mars licensed its

infringed products to Coinco, the Court determined that hypothetical negotiations

between the parties would have produced a reasonable royalty rate of 7 percent.

1

When applied to Coinco's royalty base of $205,372,320.00, this rate produces the total infringement damages amount.

Mars has requested that the Court address the application of prejudgment interest to its damages award, and argues that this interest should be applied at the historical prime rate. Coinco challenges Mars' request. The Court heard oral argument on the matter on May 22, 2007. The parties' dispute raises four issues for the Court to decide: (1) whether there are grounds to deny prejudgment interest to Mars; (2) if prejudgment interest is awarded, what rate of interest should be applied?; (3) whether simple interest or compounded interest should be applied; and (4) on what date should the prejudgment interest begin to accrue? These issues will be addressed in turn.

**II.**   **Discussion**

    **A.**   **Whether Pre-Judgment Interest Should Be Awarded to Mars**

Coinco argues first that the Court should deny Mars' request for prejudgment interest. This Court will reject this argument, and finds that Mars is entitled to some amount of prejudgment interest.

Title 35, section 284 of the United States Code states that "[u]pon finding for the claimant" in a patent infringement action, "the court shall award the

2

claimant damages adequate to compensate for the infringement, . . . together with interest and costs as fixed by the court." The United States Supreme Court has said that District Courts have discretion in deciding whether to award prejudgment interest under § 284; the law does not require "the award of prejudgment interest whenever infringement is found." General Motors Corp. v. Devex Corp., 461 U.S. 648, 656-57 (1983). However, pursuant to "Congress' overriding purpose of affording patent owners complete compensation,"

> prejudgment interest should ordinarily be awarded. In the typical case an award of prejudgment interest is necessary to ensure that the patent owner is placed in as good a position as he would have been in had the infringer entered into a reasonable royalty agreement. An award of interest from the time that the royalty payments would have been received merely serves to make the patent owner whole, since his damages consist not only of the value of the royalty payments but also the forgone use of the money between the time of infringement and the date of the judgment.

Id. at 656 (internal footnote omitted).

Coinco urges the Court to not award prejudgment interest in this case because allegedly (1) it was a close case, (2) Coinco did not cause the delay of the case's resolution, (3) Mars has already been fully compensated by the 7 percent royalty, and (4) it will result in a punitive award that detrimentally affects Coinco's business. None of these arguments have merit.

      1.    **Close Case**

Coinco claims that pre-judgment interest should be denied because of the strength of its challenge in this case.  Coinco points to Justice Stevens' concurring opinion in Devex, where he suggested that "[i]n exercising its discretion to deny [prejudgment] interest in appropriate cases, the trial court may properly take into account the nature of the patent and the strength of the defendant's challenge." Id. at 658 (Stevens, J., concurring).  Justice Stevens explained that patent challenges serve the public interest of weeding out competition-stifling "worthless patents" by permitting "a more informed decision regarding the merits of a particular patent" to be made in court. Id.  Therefore, Justice Stevens cautioned that district courts should not overlook "the category of cases in which an infringer, although ultimately unsuccessful in litigation, may have been sufficiently justified in its challenge to a particular patent to make it appropriate for the district court to exercise its discretion to deny prejudgment interest." Id. at 658-59.

Coinco claims that this case was a close one because the Court reversed its original findings that Coinco did not infringe the '137 patent (June 1994), and that Mars' '719 patent was invalid (March 2002).  A denial of prejudgment interest under Justice Stevens' concurring opinion in Devex, is therefore appropriate, asserts Coinco.

The Court rejects Coinco's argument.  The Federal Circuit Court of Appeals

4

has declined to follow Justice Stevens' <u>Devex</u> concurrence, reasoning that the strength of an infringer's challenge is immaterial to the "'guiding consideration'" of providing "'full compensation for the patent owner's loss.'" <u>Bio-Rad Laboratories, Inc. v. Nicolet Instrument Corp.</u>, 807 F.2d 964, 969 (Fed. Cir. 1986) (quoting Chisum, <u>Patents</u> § 20.03[4] at 20-172 (1986)). The Federal Circuit made clear that "a district court's justification for limiting prejudgment interest 'must have some relationship to the award of prejudgment interest.'" <u>Id.</u> at 967 (quoting <u>Radio Steel & Mfg. Co. v. MTD Prods</u>, 788 F.2d 1554, 1557-58 (Fed. Cir. 1986)). Thus, prejudgment interest will not be denied merely because this was a close, complex, or difficult case.

### 2.   **Delay**

Coinco argues that prejudgment interest should be denied because it is not at fault for the 17-year length of this case. The Court rejects this argument as well. Delay has been found to justify the denial of prejudgment interest in patent cases only "where *the patent owner* has been responsible for undue delay in prosecuting the lawsuit." <u>See Devex</u>, 461 U.S. at 657 (emphasis added). For example, in <u>Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.</u>, 246 F.3d 1336, 1361-62 (Fed. Cir. 2001), the Federal Circuit, following <u>Devex</u>, affirmed a district court's denial of prejudgment interest because the "record contain[ed]

5

sufficient evidence . . . that [the patent holder's two-year] delay was self-serving and resulted in prejudice to the defendants" by "caus[ing] the damages owed . . . to escalate."

Coinco does not claim that Mars delayed filing this lawsuit, or delayed its resolution once begun.  Thus, Coinco's assertion that it "has acted in good faith throughout the pendency of this case to resolve these matters as expediently as possible, while preserving its rights and asserting legitimate and well-founded defenses," is irrelevant.  (Coinco Opp'n Br. 7.)  The simple fact that an infringement case took a long time to be resolved does not justify a denial of prejudgment interest.  See, e.g., Allen Archery, Inc. v. Browning Mfg. Co., 898 F.2d 787, 791-92 (Fed. Cir. 1990) (rejecting request for denial of interest based on delay because the delay was not caused by plaintiff and was "neither 'undue' nor unjustified").  In Devex itself, 24 years passed between the 1956 filing of the infringement suit and the district court's imposition of royalty based damages and prejudgment interest in 1980.  See Devex Corp. v. General Motors Corp., 494 F. Supp. 1369 (D. Del. 1980).  Nevertheless, the district court there decided that the infringer "must now be charged a premium for the additional benefit it has enjoyed from retaining the use of the royalty money over the many years since its first infringement."  Id. at 1379.  The Court will not deny prejudgment interest on the

6

basis of delay.

### 3.   <u>Mars Has Allegedly Already Been Fully Compensated</u>

Coinco next argues that because the Court already concluded during its April 20, 2007 damages hearing that a 7 percent royalty rate fully compensates Mars under § 284, any further increase to this award will result in a windfall.

This argument is also meritless.  As Mars correctly points out, interest is a separate matter from reasonable royalty damages; section 284 calls for damages "adequate to compensate for the infringement . . . *together with* interest and costs as fixed by the court." (emphasis added).   Thus, the royalty compensates for the infringement, and prejudgment interest compensates for a distinct loss Mars suffered: the "forgone use of the money between the time of infringement and the date of judgment."  <u>See</u> <u>Devex</u>, at 461 U.S. at 656.

### 4.   <u>Punitive and Detrimental Affect on Coinco</u>

Finally, Coinco argues that it is unable to pay a prejudgment interest award without great difficulty.  Coinco's president attests that an award of prejudgment interest will cause Coinco to close one of its plants, fire employees, reduce spending, reduce employee benefits, and to become less competitive in the marketplace.  (<u>See</u> Coinco Opp'n Br., Ex. A.)  Coinco claims that the full-line and can/bottling vending machine markets are severely depressed, and as a result, its

7

"financial results also have been negatively impacted." (Id. at 13.)  Coinco cites media reports about the market, but offers no data revealing its own financial state.

Mars counters by claiming that Coinco is "rich and profitable."  It cites a *St. Louis Business Journal* report that estimates that Coinco made $200 million per year from 2003 to 2006.  Mars also claims that Coinco spent substantial sums of money to acquire other companies during the 1990s.

Regardless of which party is painting the more accurate picture of Coinco's financial health, this consideration is irrelevant to prejudgment interest.  Coinco fails to cite any case stating that an infringer's inability to pay is a valid justification for denying prejudgment interest, and fails to explain how inability to pay is a "justification for limiting prejudgment interest [that has] some relationship to the award of prejudgment interest," as it must under Bio-Rad Laboratories, 807 F.2d 964, 967 (internal quotations omitted).   This argument is also rejected.

"[P]rejudgment interest should be awarded under § 284 absent some justification for withholding such an award."  Devex, 461 U.S. at 657.  Because Coinco fails to offer a valid justification, the Court will award prejudgment interest to Mars.

**B.    Whether the Treasury Bill Rate or the Prime Rate Should Be the Measure of the Amount of Prejudgment Interest Awarded**

8

The district courts have broad discretion to set the appropriate prejudgment interest rate.  See, e.g., Uniroyal, Inc. v. Rudkin-Wiley Corp., 939 F.2d 1540, 1545 (Fed. Cir. 1991).  Coinco argues that the Court should use the Treasury Bill ("T-Bill") rate.  Mars argues that the prime rate should apply.[1]  The Federal Circuit has affirmed the use of both.  See Laitram Corp. v. NEC Corp., 115 F.3d 947, 955 (Fed. Cir. 1997) (affirming use of T-Bill rate); Uniroyal, 939 F.2d at 1545 (affirming use of the prime rate).  For the following reasons, the Court will apply the 52-week T-Bill rate in this case.

In Devex, the Supreme Court said that the purpose of awarding prejudgment interest "from the time that the royalty payments would have been received . . . serves to make the patent owner whole" by compensating it for "*the forgone use*" of the royalty payments had they been received.  Devex, 461 U.S. at 656 (emphasis added); see also Crystal Semiconductor, 246 F.3d at 1361 ("An award of prejudgment interest serves to make the patentee whole because the patentee

---

[1] When it first requested prejudgment interest, Mars attempted to cast its request for the prime rate as a reasonable one by claiming that its "average internal rate of return exceeds a 20% return on assets."  (See Mars' Letter of April 19, 2007, at ¶ 4.)  In response, Coinco expends a lot of energy attempting to debunk Mars' 20 percent return claim.  (See Coinco Opp'n Br. 14-17.)  All of this is irrelevant.  At no time does Mars actually request a 20 percent prejudgment interest rate.  In any event, the record is not clear enough on this subject for the Court to determine whether, and at what rate, Mars borrowed to support its business, or indeed what its overall return on its assets was during the relevant time period.

also *lost the use of its money* due to infringement." (emphasis added)).

Thus, the question the Court must ask is: what would Mars have done with the royalty payments if they had been received?   There are two courses of action that patent owners most often argue they would have taken.  First, most patent owners argue that they would have invested the royalty payments.  See, e.g., Hughes Aircraft Co. v. United States, 86 F.3d 1566, 1570 (Fed. Cir. 1996) (affirming a finding that an award of interest was "necessary to place [the infringed patent holder] in the position that it would have been had the royalties been paid timely and invested in a prudent and reasonable manner"), *vac'd on other grounds*, 520 U.S. 1183 (1997); T.J. Smith & Nephew v. Parke, Davis & Co., Nos. 92-1240, 1241, 1993 U.S. App. LEXIS 25039, at *6-7 (Fed. Cir. Sept. 28, 1993)  (discussing the patent holder's objection to using the T-Bill rate for prejudgment interest, because it claims it would have "converted a hypothetical royalty to pounds sterling and invested it in the United Kingdom at a higher rate").

Second, some patent owners argue instead that they would have used the money to avoid having to borrow money elsewhere at a high rate of interest.  See, e.g., Uniroyal, 939 F.2d at 1545 (awarding patent holder the interest rate it paid to borrow money in order to finance its operations during the infringement litigation); Sun Studs Inc. v. ATA Equipment Leasing Inc., No. 78-714-RE, 1990

U.S. Dist. LEXIS 18672, at *9-10 (D. Ore. Sept. 19, 1990) (calculating

prejudgment interest "based on interest rates actually charged plaintiff for short-

term borrowing during the applicable periods").

Accordingly, in order to make Mars whole, the Court must determine

whether it would have used the money to invest, or to avoid borrowing, determine

the percentage yield that Mars either would have earned, or avoided paying, and

then charge that rate to Coinco as prejudgment interest.

Where a patent holder can show evidence of the actual investment rate it

would have earned, or the actual borrowing rate it would have avoided, courts

have used that rate as the prejudgment interest rate.  See Micro Motion Inc. v.

Exac Corp., 761 F. Supp. 1420, 1436 (N.D. Cal. 1991) (rejecting the T-Bill rate in

light of evidence that the patent holder invested all of its additional cash into a

specific account that earned higher rates); Sun Studs Inc, 1990 U.S. Dist. LEXIS

18672, at *8 (finding that "Plaintiff is entitled to be compensated for the actual

amount of interest it paid" on borrowed money).  However, such proof is rare, and

indeed, Mars does not offer any such proof here.  The vast majority of courts

award either the T-Bill rate or the prime rate as a rough estimation of what the

infringed patent holder could have earned, or could have avoided paying,

respectively.

11

### 1.     The Prime Rate

The prime rate is the rate "offered by banks on short-term loans to their 'best' corporate borrowers, meaning those regarded as least likely to default on their debts (typically very large corporations)."  (Decl. of Daniel L. Jackson, ¶ 9.) Mars asserts two arguments for using the prime rate over the, typically lower, T-Bill rate.  The Court rejects both arguments.

### (a)     Mars Claims it is in a Lender-Borrower Relationship with Coinco

First, Mars argues that the prime rate is a better approximation of its loss than the T-Bill rate, because unlike the prime rate, the T-Bill rate "has no relation to the rate a corporate borrower would ever receive for a long-term loan, in this instance a loan of over 20 years."  (Mars Reply Br. 9.)  Mars explains that the higher prime rate better reflects the risk of non-payment by the infringer of the damages award than does the T-Bill rate, since the lower T-Bill rate reflects that the United States Government is considered a risk-free borrower.

This argument confuses the nature of the infringement damages inquiry. That inquiry creates a hypothetical license, not a hypothetical loan.  The district court "calculates a reasonable royalty by postulating a hypothetical negotiation between a willing licensor and licensee at the time infringement commenced.

[citation omitted]  This hypothetical construct seeks the percentage of sales or profit likely to have induced the hypothetical negotiators to license use of the invention." <u>Minco Inc. v. Combustion Eng'g</u>, 95 F.3d 1109, 1119 (Fed. Cir. 1996).  Instead, Mars seeks to treat the situation as if it had loaned Coinco the sum total of the now-owed royalties at the time of infringement, and therefore should receive the interest rate a bank would receive lending money to a corporate borrower.  However, Coinco owes Mars damages, not in the form of hypothetical loan payments, but as hypothetical royalty payments as a licensee.  Mars and Coinco are not, and never have been (hypothetically or otherwise) in a lender-borrower relationship.

Mars' loan analogy is also inappropriate because in the lender-borrower relationship, the borrower (Coinco) would be indebted to the lender (Mars) for the entire $14,376,062.00 "loan" at the beginning of the repayment schedule.  Thus, the prime rate, which compensates the lender for the risk of default on this amount, would be applied to the entire balance as it was amortized, and Coinco's first payment would constitute mostly interest.  However, this is obviously not the situation here in a licensor-licensee relationship, because Coinco would not have been indebted for all yet-to-be-made royalty payments at the beginning of its royalty payment schedule.  Each royalty payment compensates the licensor for the

licensee's use of the patented product to that point in time.  It does not pay down an outstanding debt.  Thus, there is no risk of default for which to compensate the licensor.  Furthermore, at the beginning of the royalty payments, there would have been no outstanding balance for Mars to apply the prime rate to, and therefore, no interest aspect to Coinco's royalty payments that Mars would have missed out on.

Instead, the loss Mars suffers in the licensee-licensor relationship results from Mars' lost ability to either invest each royalty payment once it should have been received, or to avoid paying a high interest rate to borrow money– in other words, "the forgone use" of the royalty payments.  See Devex, 461 U.S. at 656. This is the loss that prejudgment interest on infringement damages must compensate for, not the risk of default on an imaginary hypothetical loan.  See Hoechst Celanese Corp. v. BP Chemicals Ltd., 846 F. Supp. 542, 550-51 (S.D. Tex. 1994) ("[T]he Court is mindful that the purpose of pre-judgment interest is *solely* to compensate the patentee for the lost use of the royalty income he should have been paid.  Accordingly, the Court finds the T-bill rate to the be appropriate standard." (emphasis added)), *aff'd*, 78 F.3d 1575 (Fed. Cir. 1996).

However, Mars' position has been explicitly adopted by at least two courts. In In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig., 831 F. Supp. 1354, 1394-95 (N.D. Ill. 1993), the District Court adopted the prime rate,

explaining that:

> [Plaintiffs] have had their funds at risk.  Winners in litigation are not called "judgment creditors" for nothing.  They have made a large, involuntary, unsecured loan to a debtor of uncertain credit-worthiness that is doing its utmost to avoid paying.  In the market the rate of interest on such loans greatly exceeds the rate the United States Government has to pay—a rate that economists usually call the "risk free rate."  Plaintiffs did not make a risk-free loan.

Id.; see also Grain Processing Corp. v. Am. Maize-Prods. Co., 893 F. Supp. 1386, 1396 (N.D. Ind. 1995) (following In re Mahurkar).  But the fact is that prior to judgment, Mars did not make a loan at all.  After judgment, there is a "loan" in the sense that a judgment creditor and debtor relationship now exists; however, there is no evidence of risk of non-payment of that judgment that might justify use of the prime rate.  Similarly, in Black & Decker v. Robert Bosch Tool Corp., No. 04-C-7955, 2006 U.S. Dist. LEXIS 84969, at *33 (N.D. Ill. Nov. 20, 2006), the District Court explained that the prime rate should not be used because

> [the patent holder] should not be compensated for the risk of default which is not present under the circumstances because the jury already decided the amount of damages and [the infringer's] ability to pay . . . . Accordingly, if the Court were to use the prime rate, [the patent holder] would be compensated for the risk of non-repayment – a risk that does not exist under the circumstances.

Id.

Prior to judgment, the proper relationship for the damages inquiry is a

licensor-licensee relationship, not a lender-borrower relationship. Thus, Mars'

analogy fails to justify using the prime rate.

### (b)    Compensation for Mars' Cost of Borrowing

Mars implicitly asserts a second argument for using the prime rate. Mars

cites to cases where, as mentioned above, courts applied the prime rate because

there was evidence that the patent holder's "poor financial condition during the

pendency of the litigation required it to finance its operations with monies

borrowed at rates above the prime rate." Uniroyal, 939 F.2d at 1545; see also Sun

Studs Inc., 1990 U.S. Dist. LEXIS 18672, at *8-10. As opposed to the loan

rationale for the prime rate, which erroneously casts the patent holder as a lender,

this rationale seeks to apply the prime rate to the patent holder as a borrower.

Typically, Courts permit this where there is evidence that the plaintiff would have

been spared from borrowing money at the prime rate during the infringement

period had the infringer been paying royalties, and thus, prejudgment interest at

the prime rate is necessary to compensate for "the forgone use of the money." See

Devex, 461 U.S. at 656. Had the patent holder received the infringer's royalties, it

would have used that money instead of borrowing at the prime rate. See, e.g.,

Promega Corp. v. Lifecodes Corp., No. 2:93-CV-0184C, 1999 U.S. Dist. LEXIS

21094, at *57 (D. Utah Oct. 27, 1999) (concluding that the prime rate would most

16

"fairly compensate [the patentee] for the loss of the use of its money . . . because "[the patentee's] borrowing rate [most] closely approximated the prime rate," as testified to by the patentee's damages expert).

In this case, Mars put forth no evidence that it borrowed money during the infringement period at the prime rate. Indeed, it put forth no evidence that it borrowed money at all. It is true, as Mars points out, that the Federal Circuit stated in Uniroyal that "it is not necessary that a patentee demonstrate that it borrowed at the prime rate in order to be entitled to prejudgment interest at that rate," due to the court's "wide latitude in the selection of interest rates," 939 F.2d at 1545; however, where there is no evidence that the patent owner had to borrow at all, and where there is evidence of an investment rate that will sufficiently compensate the plaintiff (here, the T-Bill rate), the Court finds that the more prudent approach is to utilize the investment rate. See Laitram Corp., 115 F.3d at 955 (affirming use of T-Bill rate absent evidence that the patent owner "borrowed money at a higher rate, what that rate was, or that there was a causal connection between any borrowing and the loss of the use of the money awarded as a result of [defendant's] infringement").

### 2.   The T-Bill Rate Will Be Utilized

T-Bills are short-term debt securities issued by the U.S. government and

sold to investors at weekly auctions.  T-Bills reach maturity in one-year or less.

(Jackson Decl. at ¶ 6.)  As the Federal Circuit has recognized, the three-month T-

Bill rate "represents a benchmark as the shortest term, risk-free investment

available to ordinary investors."  Allen Archery, 898 F.2d at 789.

Coinco argues that the Court should use the T-Bill rate because its use is the

modern trend among courts.  (See Coinco Surreply Br. 2.)  It is difficult to tell if

there is an actual trend in any direction.  Due to the district courts' wide discretion,

and varying factual circumstances, discerning accurate trends can be elusive.

However, there are three reasons why this Court will apply the T-Bill rate in this

case.

First, some courts, including the Federal Circuit, have applied the sensible

approach that the T-Bill rate should be used as a baseline investment rate, absent

evidence that the patent holder is entitled to a better rate, either because it had to

borrow at a higher rate to cover the lost funds, or because it would have invested

at a better rate.  See Laitram, 115 F.3d at 955; Transocean Offshore Deepwater

Drilling, Inc. v. GlobaSantaFe Corp., No. H-03-2910, 2006 U.S. Dist. LEXIS

80931, at *19 (N.D. Tex. Nov. 6, 2006) ("Because [the patentee] has failed to

demonstrate that the prime rate or a higher rate is necessary to fully compensate it

for [defendant's] infringement, the court concludes that the prejudgment interest

should be based on the three-month [T-Bill rate]."); Intex Plastic Sales Co. v. Hall,
No. C-85-2987-JPV, 1991 U.S. Dist. LEXIS 20476 at *13-14 (N.D. Cal. July 10,
1991) (rejecting patent owner's argument that a "higher rate is more appropriate
because there was no evidence at trial that he would simply have invested the
money in T-bills," citing the fact that a riskier investment could have resulted in a
total loss); BIC Leisure Prods Inc. v. Windsurfing Int'l Inc., 761 F. Supp. 1032,
1041 (S.D.N.Y. 1991) (choosing the T-Bill rate because the patent holder "has not
demonstrated that interest at a rate higher than the Treasury Bill rate is necessary
to compensate it for the economic loss caused by [the] infringement"), *vac'd on*
*other grounds sub nom*, Windsurfing Int'l Inc. v. AMF Inc., 828 F.2d 755 (Fed.
Cir. 1987).   Similarly here, Mars has failed to even argue that it either borrowed
or invested at a rate higher than the T-Bill rate.

Second, because T-Bills are a virtually risk-free investment, using the T-Bill
rate permits the Court to avoid the speculation involved with determining whether
possibly higher-yielding, but riskier, investments would have been successful for
the patent holder.  In Intex Plastic Sales Co., 1991 U.S. Dist. LEXIS 20476 at *13-
14, the District Court for the Northern District of California applied the T-Bill rate
despite having no evidence before it that the patent holder would have actually
invested in T-Bills, because it was just as speculative to assume the patent owner

would have successfully invested in a higher-yielding investment.  The court

observed that the patent owner "could easily have invested it all in some

spectacularly unsuccessful venture and lost every penny."  Id.

Third, the 52-week T-Bill rate is the statutorily prescribed measure for *post-
judgment* interest.  See 28 U.S.C. § 1961.  Courts have found this fact persuasive

in utilizing the T-Bill rate for pre-judgment interest as well.  See Intex Plastic

Sales Co., 1991 U.S. Dist. LEXIS 20476 at *14 (applying "the Treasury Bill rate

of 28 U.S.C. § 1961"); National Presto Indus., Inc. v. Black & Decker, Inc., No. 89

C 8978, 1992 U.S. Dist. LEXIS 7145, at *21 (N.D. Ill., May 27, 1992) (patent

owner "will be fully compensated by being given the interest rate it could have

earned if it had had the money to invest, the interest rate that is statutorily

established for post-judgment interest: the Treasury Bill rate").  On at least one

occasion, the Federal Circuit affirmed the use of the T-Bill rate where the District

Court said it used that rate because it is the post-judgment interest rate under §

1961.  See Datascope Corp. v. SMEC, Inc., 879 F.2d 820, 829 (Fed. Cir. 1989)

("[W]e are unconvinced here that the Treasury bill rate of section 1961 fails to

'adequately compensate' [the plaintiff].").

For the foregoing reasons, the Court should will apply the 52-week T-Bill

rate as the measure of prejudgment interest in this case.

C.    **Whether Simple Interest or Compounded Interest Should Be Applied**

Whether to award simple or compound interest is within the discretion of the district court.  See Lam, Inc., 718 F.2d at 1066.  Coinco argues for simple interest; however, it fails to offer any reasoned economic basis for doing so.  It largely falls back on its arguments as to why the Court should deny any award of prejudgment interest in the first place.  (See Coinco Opp'n Br. 22.)

Mars points out valid reasons why prejudgment interest should be compounded.  First, § 1961(b) provides for compounded, post-judgment interest at the T-Bill rate.   Second, according to Chisum on Patents, most courts award compound rather than simple prejudgment interest.  See Chisum, Patents, § 20.03 at 325-26 (citing cases).  Finally, Mars cites a Central District of California District Court decision that aptly explains the economic rationale for compounding prejudgment interest: "In applying prejudgment interest, courts have recognized that compounding is necessary to fully compensate the patentee. Because a patentee's damages include the forgone use of money, compounded is needed to account for the time value of money."  AMP Inc. v. Lantrans, Inc., No. CV 90-1525-DWW, 1991 WL 253796, at *7 (C.D. Cal. Nov. 7, 1991).  The Court agrees and will compound the prejudgment interest.

21

The issue of what form of compounding to apply remains.  Mars asks for annual compounding.  (See Mars Br. 1.)  Coinco does not contest this request. The Federal Circuit has repeatedly affirmed annual compounding.  See Chisum, Patents, § 20.03 at 325-26 & n.75 (citing cases).  The Court will apply the 52-week T-Bill rate, compounded annually.

### D.    On What Date Should the Prejudgment Interest Begin to Accrue?

Coinco argues that it "should not be liable for prejudgment interest during the period when the Court concluded that Coinco did not owe anything to Mars." (Coinco Opp'n Br. 24-25.)  In June 1994, the Court held that Coinco did not infringe the '137 patent.  This decision was later reconsidered and reversed in December 1999.  Similarly, the Court held claim 23 of the '719 patent invalid in March 2002.  The Court later reversed that decision in August 2004.  Coinco asks the Court to stay commencement of prejudgment interest until the dates the Court found that Coinco infringed the '137 and '719 patents.  Coinco argues that "prejudgment interest is not warranted when the judgment debtor is unaware of the amount owed and therefore is not able to calculate its indebtedness and pay it off." (See Coinco Opp'n Br. 24).  Coinco compares this period of time to a stay of a case, and cites the Federal Circuit's ruling in Uniroyal, that  prejudgment interest does not accrue during such a stay.  939 F.2d at 1546.

However, as Mars points out, Coinco's reliance on Uniroyal is unavailing. In that case, it was the *patent owner* who requested the stay.  939 F.2d at 1546. Thus, the stay represented a delay in the proceedings caused by the plaintiff, akin to the undue delay the Crystal Semiconductor Court relied on to justify limiting prejudgment interest, because such "delay [is] self-serving and resulted in prejudice to the defendants" by "caus[ing] the damages owed . . . to escalate."  246 F.3d at 1361-62; cf. Allen Archery, 898 F.2d at 791-92 (rejecting request to deny prejudgment interest during a stay because the plaintiff "cannot be said to have 'caused,' . . . the [resulting] three-year delay" since the plaintiff originally opposed the stay); see also Devex, 461 U.S. at 657 (finding  that delay justifies the denial of prejudgment interest "where the patent owner has been responsible for undue delay in prosecuting the lawsuit").

As the Supreme Court explained in Devex, "[a]n award of interest *from the time that the royalty payments would have been received* merely serves to make the patent owner whole."  461 U.S. at 655-56.  Here, under the negotiated reasonable-royalty construct used by the Court, royalty payments would have been received from the time of infringement, regardless of subsequent litigation events not attributable to delay caused by either party.  Thus, Coinco's assertions are

rejected.[2]

## IV.   <u>Conclusion</u>

For the foregoing reasons, Mars is awarded prejudgment interest based on the 52-week Treasury Bill rate, compounded annually, starting from the time the royalty payments would have been received.  According to Coinco's calculations, this amounts to $12,429,088.00 in prejudgment interest.  (<u>See</u> Coinco Opp'n Br. 22, Ex. C.)   Final judgment will be entered in favor of Mars in the amount of $26,805,150.00, consisting of $14,376,062.00 in reasonable royalty infringement damages, and $12,429,088.00 prejudgment interest.

/s/ John C. Lifland, U.S.D.J.

May 22, 2007

_____

[2] The Court agrees with Mars' position at oral argument that if the Court of Appeals had changed this Court's mind for it, rather than the Court changing its mind itself as to both the '137 and the '719, prejudgment interest (based on a hypothetical reasonable royalty from the date of first infringement) would still be available.