# United States Court of Appeals for the Federal Circuit

2007-1409, -1436

MARS, INCORPORATED,

Plaintiff/Counterclaim Defendant-
Appellant,

and

MARS ELECTRONICS INTERNATIONAL, INC.,

Plaintiff/Counterclaim Defendant,

and

M&M/MARS INCORPORATED,

Counterclaim Defendant,

v.

COIN ACCEPTORS, INC.,

Defendant/Counterclaimant-
Cross Appellant.

John B. Pegram, Fish & Richardson P.C., of New York, New York, argued for plaintiff/counterclaim defendant-appellant. With him on the brief were Autumn J.S. Hwang; and Michael E. Florey and Kraig A. Jakobsen, of Minneapolis, Minnesota.

Kenneth J. Mallin, Bryan Cave LLP, of St. Louis, Missouri, argued for defendant/counterclaimant-cross appellant. With him on the brief was K. Lee Marshall.

Appealed from: United States District Court for the District of New Jersey

Judge John C. Lifland

# United States Court of Appeals for the Federal Circuit

2007-1409, -1436

MARS, INCORPORATED,

Plaintiff/Counterclaim Defendant-Appellant,

and

MARS ELECTRONICS INTERNATIONAL, INC.,

Plaintiff/Counterclaim Defendant,

and

M&M/MARS INCORPORATED,

Counterclaim Defendant,

v.

COIN ACCEPTORS, INC.,

Defendant/Counterclaimant-Cross Appellant.

Appeals from the United States District Court for the District of New Jersey in Case No. 90-CV-00049, Senior Judge John C. Lifland.

———————————

DECIDED:  June 2, 2008

———————————

Before LINN, Circuit Judge, CLEVENGER, Senior Circuit Judge, and PROST, Circuit Judge.

Linn, Circuit Judge.

This case involves standing and damages for patent infringement.   Mars Incorporated ("Mars") appeals from the judgment of the United States District Court for the District of New Jersey precluding Mars from recovering damages on a lost profits

theory and denying Mars's motion to amend its complaint to add its subsidiary as a co-plaintiff in its infringement action against Coin Acceptors, Inc. ("Coinco").  Mars, Inc. v. Coin Acceptors, Inc., No. 90-CV-0049, 2006 WL 2927239 (D.N.J. May 19, 2006) (denial of motion to amend and grant of summary judgment on lost profits theory);  Mars, Inc. v. Coin Acceptors, Inc., No. 90-CV-0049, 2006 WL 2927240 (D.N.J. Aug. 7, 2006) (grant in part of motion for reconsideration); Mars, Inc. v. Coin Acceptors, Inc., No. 90-CV-0049, 2006 WL 2990371 (D.N.J. Oct. 18, 2006) (denial of motion to reconsider reconsideration).  Coinco cross-appeals the district court's judgment that Mars had standing to recover damages for the period between 1996 and 2003, and it appeals the reasonable royalty rate imposed by the district court.  Mars, 2006 WL 2927240; Mars, 2006 WL 2990371; Mars, Inc. v. Coin Acceptors, Inc., No. 90-CV-0049, slip. op. (D.N.J. May 22, 2007) (final judgment on damages).

We agree with the district court that Mars was not entitled to recover on a lost profits theory and that Mars's subsidiary lacked standing prior to 1996.  We likewise find no error in the district court's determination of a reasonably royalty rate.  We disagree, however, with the district court's conclusion that Mars had standing to recover damages for the period between 1996 and 2003.  The court therefore affirms-in-part, reverses-in-part, and remands.

## I. BACKGROUND

The patents-in-suit relate to technology used in vending machines to authenticate coins.  Mars is a candy company.  Mars's former subsidiary—Mars Electronics International, Inc. ("MEI")—manufactures and sells vending machine coin changers with the ability to recognize and authenticate coins electronically.  Mars itself does not make and has never made vending machine coin changers.

Until 2006, MEI was a wholly owned subsidiary of Mars. Mars maintained consolidated financial statements that reflected the profits, losses, assets, and liabilities of all of its subsidiaries, including MEI. However, prior to 1996, MEI also had a royalty agreement with Mars, under which MEI made payments to Mars "[b]ased on gross sales value" of coin changers using Mars's patented technology. J.A. 4131 (deposition testimony of Mars's Corporate Tax Director Thomas G. Cornell). The royalty payments from MEI to Mars were structured as in a typical intellectual property licensing agreement: "even if MEI did not make a profit, [it was] still obligated to pay a royalty to Mars." Id.

On January 5, 1990, Mars brought this action against Coinco, alleging that certain Coinco products infringed U.S. Patents No. 3,870,137 ("'137 patent") and No. 4,538,719 ("'719 patent"). Mars owned both the '137 patent and the '719 patent at the time it filed suit. Coinco counterclaimed, alleging infringement of four of its own patents, and MEI (which manufactured the devices accused of infringing Coinco's patents) was added as a counterclaim defendant.

Following consolidation with a related declaratory judgment case and trial, the district court found that Coinco infringed both the '137 and the '719 patents, but that Mars did not infringe Coinco's asserted patents. On November 17, 2005, the district court entered final judgment on liability pursuant to Rule 54(b). Coinco appealed, and this court affirmed the district court's liability judgment.

The district court then began proceedings on damages. During the fifteen years that the infringement action was pending, several key events occurred that limited the

damages available to Mars.  First, on March 1, 1992, the '137 patent expired.  Mars, 2006 WL 2927240, at *6.

Second, on March 31, 1994, Coinco introduced non-infringing alternative technology for electronic coin authentication.  The parties therefore agreed that Mars was not entitled to lost profits for any lost sales after March 31, 1994.

Third, on January 1, 1996, Mars entered into a set of agreements (collectively, the "1996 Agreements") with MEI and another Mars subsidiary in the United Kingdom, which was also called Mars Electronics International ("MEI-UK").  Mars and MEI-UK had been involved in a dispute with the United Kingdom's taxing authority (at that time known as Inland Revenue), concerning the tax treatment of royalty payments from MEI-UK to its parent Mars.  The 1996 Agreements resolved this dispute by transferring certain rights from Mars to MEI, and by establishing that MEI-UK would pay Mars royalties at agreed-upon diminishing rates, beginning at 5% in 1996, and gradually declining to 2% in 2004.  Specifically, effective January 1, 1996, Mars transferred to MEI: "its entire interest in the Covered Intellectual Property that relates to the business of the Parties."  J.A. 4942.  The "Covered Intellectual Property" was defined as "those letters patent" that "the Parties have been heretofore using and exploiting, in the conduct of their businesses."  J.A. 4941.

Finally, on July 1, 2003, the '719 patent expired.  Mars, 2006 WL 2927240, at *6. The parties agree that Mars is not entitled to any damages for infringing sales after that date.

Mars sought the following damages:   (1) lost profits, or, at minimum, a reasonable royalty for sales prior to March 31, 1994 (the period prior to Coinco's

introduction of alternative technology); and (2) a reasonable royalty on Coinco's sales from April 1, 1994 until July 1, 2003 (the remaining life of the patents).   Coinco acknowledged that Mars was entitled to a reasonable royalty prior to January 1, 1996 (the date on which the 1996 Agreements took effect), but disputed both Mars's claim to lost profits and its claim to any damages after January 1, 1996.

Before the damages trial, Coinco moved for partial summary judgment on Mars's claim for lost profits damages.  Mars, 2006 WL 2927239, at *4.  Mars, conversely, moved for leave to amend its complaint to join MEI as a co-plaintiff.  Id. at *1.  The district court granted Coinco's summary judgment motion, reasoning that Mars itself did not lose any sales (because it did not sell coin changers itself), and that there was no evidence that profits from MEI's sales flowed inexorably to Mars.  Id. at *5-6.  The district court also denied Mars's motion for leave to amend as futile, reasoning that MEI lacked standing in the infringement action, because it was neither the owner nor the exclusive licensee of the patents-in-suit.  Id. at *3-4.

On Mars's motion for reconsideration, the district court modified its ruling on Mars's motion for leave to amend.  The court held that the 1996 Agreements assigned all of Mars's interest in the '719 patent to MEI, and it therefore reasoned that MEI—but not Mars—had standing to pursue claims from January 1996 forward.  Mars, 2006 WL 2927240, at *8. But relying on our holding in Schreiber Foods, Inc. v. Beatrice Cheese, Inc., 402 F.3d 1198 (Fed. Cir. 2005), the district court further held that Mars's lack of standing for the period after 1996 could "be cured by the 'imminent' transfer back to Mars of the rights to the '137 and '719 patents before final judgment."  Mars, 2006 WL 2927240, at *8.

On March 31, 2006, Mars and certain of its subsidiaries, including MEI, entered into a purchase agreement for the sale of certain parts of the subsidiaries' businesses to Mars. The purchase agreement was not made part of the record, either before the district court or on appeal. Mars's counsel represented to the district court that the purchase agreement did "not clearly state what [was] needed to be stated for this case," and that it would "not rear its ugly head" in the litigation. J.A. 3914. Instead, what was offered was an agreement between Mars and MEI entitled "COINCO CONFIRMATION AGREEMENT," effective June 19, 2006 ("Confirmation Agreement"). J.A. 3177. The Confirmation Agreement stated that "Mars and [MEI] do hereby acknowledge that Mars owns and retains the right to sue for past infringement of the Litigation Patents"—i.e., the '137 and '719 patents. J.A. 3177-78. Apparently treating the Confirmation Agreement as a transfer of all of MEI's rights back to Mars, the district court held that MEI now lacked standing to pursue any claim for damages, but that Mars was entitled to recover damages during the period when MEI had owned the patents.

The district court held a four-day bench trial on damages to determine the appropriate amount of a reasonable royalty. Following this trial, the district court issued a detailed oral opinion from the bench (spanning forty-six transcript pages), analyzing the fifteen Georgia-Pacific factors and concluding that a blended 7% royalty rate for the two patents was reasonable. After resolving post-trial motions, the district court applied this 7% royalty rate to Coinco sales up to July 1, 2003, resulting in damages of $14,376,062. The district court awarded prejudgment interest and entered final judgment on May 22, 2007.

Both parties timely appealed.  We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## II. DISCUSSION

We address four issues raised by this appeal:  (1) whether Mars was entitled to lost profits; (2) whether MEI had standing to recover damages incurred prior to 1996; (3) whether Mars had standing to recover damages incurred from 1996 to 2003; and (4) whether the district court erred by imposing a 7% royalty rate.

### A. Lost Profits

The district court granted Coinco's motion for summary judgment on Mars's claim of lost profits because it concluded that:  (1) Mars's arrangement with MEI was a licensing arrangement, rather than an arrangement where profits "flow[ed] inexorably from MEI to Mars"; (2) Mars's nonexclusive licensing policy signified that it expected only reasonable royalties, rather than lost profits; and (3) Mars lacked the capacity to manufacture the patented products itself, without relying on MEI.  Mars, 2006 WL 2927239, at *6.  The district court relied particularly on Poly-America L.P. v. GSE Licensing Technology, Inc., a case in which we held that a patent holder is not entitled to recover under a lost profits theory as a result of sales lost by a sister corporation, absent a showing that the patent holder itself had lost profits.  383 F.3d 1303, 1311 (Fed. Cir. 2004).

"This court reviews without deference a district court's grant of summary judgment, reapplying the same standard as the district court."  Micro Chem., Inc. v. Lextron, Inc., 318 F.3d 1119, 1121 (Fed. Cir. 2003). We must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

"Availability of lost profits is a question of law reviewed without deference."  Micro

Chem., 318 F.3d at 1122 (citing Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1544 (Fed.

Cir. 1995) (en banc)); see also Poly-America, 383 F.3d at 1311 ("Whether lost profits

are legally compensable in a particular situation is a question of law that we review de

novo.").

Mars argues that Poly-America does not preclude a parent from recovering the

lost profits of its wholly owned subsidiary, and that the consolidated financial statements

prove that "all MEI's lost profits were inherently lost profits of Mars."  Appellant's Br. 18.

Coinco responds by arguing that Mars cannot meet the "manufacturing and marketing

capability" element of the Panduit lost profits test, and that the record does not support

Mars's theory that all profits inherently flowed to Mars from MEI.  Micro Chem., 318 F.3d

at 1124.  There is no dispute that MEI's lost sales may have caused harm to Mars.

See, e.g., Mars, 2006 WL 2927239, at *5 (acknowledging the "economic reality" that a

parent corporation loses money when its wholly owned subsidiary loses money).  The

dispute is whether that harm is compensable under a lost profits theory.

Patent infringement is a tort.  Schillinger v. United States, 155 U.S. 163, 196

(1894).  "In patent cases, as in other commercial torts, damages are measured by

inquiring:  had the tortfeasor not committed the wrong, what would have been the

financial position of the person wronged?"  Brooktree Corp. v. Advanced Micro Devices,

Inc., 977 F.2d 1555, 1579 (Fed. Cir. 1992); see also  Aro Mfg. Co. v. Convertible Top

Replacement Co., 377 U.S. 476, 507 (1964) (stating damages analysis as assessing

"had the Infringer not infringed, what would the [Patentee] have made?").

Damages in patent infringement cases are governed by 35 U.S.C. § 284:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

35 U.S.C. § 284.  "[W]hile the statutory text states tersely that the patentee receive 'adequate' damages, the Supreme Court has interpreted this to mean that 'adequate' damages should approximate those damages that will <u>fully compensate</u> the patentee for infringement."  <u>Rite-Hite</u>, 56 F.3d at 1545 (emphasis in the original).  In enacting § 284, "Congress sought to ensure that the patent owner would in fact receive full compensation for 'any damages' he suffered as a result of the infringement."  <u>Gen. Motors Corp. v. Devex Corp.</u>, 461 U.S. 648, 654-55 (1983); <u>see also</u> <u>Fromson v. W. Litho Plate & Supply Co.</u>, 853 F.2d 1658 (Fed. Cir. 1988) ("The statute, 35 U.S.C. § 284, mandates that damages shall be 'adequate to compensate' the patent owner for the infringement.  That requirement parallels the criterion long applicable in other fields of law."), <u>overruled on other grounds by</u> <u>Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.</u>, 383 F.3d 1337 (Fed. Cir. 2004) (en banc).

Despite the broad damages language of § 284, patentees tend to try to fit their damages cases into the "lost profits" framework, or else fall back on the statutory grant of a reasonable royalty.  <u>See, e.g.</u>, 7 Donald S. Chisum, <u>Chisum on Patents</u> § 20.01 (2005) ("The three traditional modes of measuring compensatory damages are lost profits, established royalty, and reasonable royalty."); Herbert F. Schwartz, <u>Patent Law and Practice</u>, 212 (5th ed. 2006) ("The two traditional measures of monetary damages awarded under 35 U.S.C. §284 are lost profits and royalties . . . .").  But while lost profits is plainly one way to measure the amount of damages that will "fully compensate" the

patentee under § 284, we have never held that it is the only one. "The assessment of adequate damages under section 284 does not limit the patent holder to the amount of diverted sales of a commercial embodiment of the patented product." Minco, Inc. v. Combustion Eng'g, Inc., 95 F.3d 1109, 1118 (Fed. Cir. 1996); see also Rite-Hite, 56 F.3d at 1544 ("[T]he language of the statute is expansive rather than limiting.    It affirmatively states that damages must be adequate, while providing only a lower limit and no other limitation." (emphasis added)).    We have previously recognized that patentees may be entitled to damages above a reasonable royalty on theories entirely distinct from lost profits.    See, e.g., Minco, 95 F.3d at 1120 (recognizing that the patentee might have been entitled to damages as a result of overpaying for the infringer's business, if it had proven that the infringing products were an important factor in the sale).    Nevertheless, Mars expressly elected to pursue only lost profits and reasonable royalty theories, and it stipulated that it would not seek "any other damages other than lost profits or a reasonable royalty."    J.A. 2268.2 (Stipulation Concerning Damages, Doc. No. 321, Feb. 3, 2006).    Mars is bound by this stipulation.    Thus, we need not determine whether Mars would have been entitled to recover under any other damages theory for the economic injury that it suffered as a result of MEI's lost sales.

The correct measure of damages is a highly case-specific and fact-specific analysis.    See Herbert v. Lisle Corp., 99 F.3d 1109, 1119 (Fed. Cir. 1996) ("The adequacy of the damages measure depends on the circumstances of each case."); Rite-Hite, 56 F.3d at 1546 ("The general principles expressed in the common law tell us that the question of legal compensability is one 'to be determined on the facts of each

case upon mixed considerations of logic, common sense, justice, policy and precedent.'" (citing 1 Street, Foundations of Legal Liability 110 (1906))).

Mars claims that, by virtue of the parent-subsidiary relationship and its consolidated financial statements, "all MEI's lost profits were inherently lost profits of Mars." Appellant's Br. 18 (emphasis added); see also id. at 2 ("The parent company here—Mars—was inherently damaged by the infringement injury to its 100% owned subsidiary—MEI—through that ownership and their consolidated financial statements." (emphasis added)); Mars, 2006 WL 2927239, at *5 ("Mars seeks to distinguish Poly-America based on the corporate structure between itself and MEI and on the theory that MEI's profits flowed inexorably to Mars, thus permitting Mars to recover the lost profits that MEI would have made absent infringement." (emphasis added)). But, as the district court concluded, the facts do not support this claim.

The uncontradicted testimony of Mars's Corporate Tax Director, Thomas Cornell, shows that Mars and MEI had a traditional royalty-bearing license agreement. MEI paid Mars a royalty "[b]ased on gross sales value" of MEI's products that use Mars's patented technology, and MEI was required to make those royalty payments whether or not it made any profit. J.A. 4131. Mars identified no record evidence that it ever received or recognized any form of profit or revenue from MEI apart from these royalty payments. Cf. Mars, 2006 WL 2927239, at *6 (quoting testimony of Mr. Cornell that he was not sure whether MEI ever paid any profits to Mars and concluding that "Mr. Cornell did not say, as Mars argues, that profits flow inexorably from MEI to Mars"). Thus, Mars's claim that it "inherently" lost profits when MEI lost profits is unsupported by the

record, as the district court correctly concluded.  The district court was correct to grant summary judgment on this basis.

Because we conclude that MEI's profits did not—as Mars argued—flow inexorably to Mars, we, like the Poly-America court, need not decide whether a parent company can recover on a lost profits theory when profits of a subsidiary actually do flow inexorably up to the parent.  See Poly-America, 383 F.3d at 1311 ("[I]t is not clear here whether Poly-America has itself suffered lost profits from the infringement, a matter that may be dealt with on remand . . . .")  We hold simply that the facts of this case cannot support recovery under a lost profits theory.

### B. MEI's Standing (Prior to 1996)

The district court denied as futile Mars's motion to amend its complaint to add MEI as a co-plaintiff for infringement that occurred prior to 1996.  Specifically, the district court held that the motion would be futile because MEI lacked standing prior to 1996, when it was neither the owner nor the exclusive licensee of either of the patents-in-suit.  Mars appeals, claiming that MEI was an implied and de facto exclusive licensee.  Our review is de novo.  See Rite-Hite, 56 F.3d 1538, 1551 ("The question of standing to sue is a jurisdictional one, which we review de novo." (citations omitted)).

Only a patent owner or an exclusive licensee can have constitutional standing to bring an infringement suit; a non-exclusive licensee does not.  Sicom Sys., Ltd. v. Agilent Techs., Inc., 427 F.3d 971, 976 (Fed. Cir. 2005) ("A nonexclusive license confers no constitutional standing on the licensee to bring suit or even to join a suit with the patentee because a nonexclusive licensee suffers no legal injury from infringement." (internal citations omitted)); Schreiber Foods, 402 F.3d at 1202-03 ("It is well-settled that non-exclusive licensees do not have constitutional standing to sue.").  "This standing

deficiency cannot be cured by adding the patent title owner to the suit." <u>Morrow v.</u>
<u>Microsoft Corp.</u>, 499 F.3d 1332, 1341 (Fed. Cir. 2007). It is undisputed that MEI did not
own either of the patents-in-suit prior to 1996. The issue is only whether MEI was an
exclusive licensee.

"To be an exclusive licensee for standing purposes, a party must have received,
not only the right to practice the invention within a given territory, but also the patentee's
express or implied promise that others shall be excluded from practicing the invention
within that territory as well." <u>Rite-Hite</u>, 56 F.3d at 1552. By the same token, if the
patentee <u>allows</u> others to practice the patent in the licensee's territory, then the licensee
is <u>not</u> an exclusive licensee.

In the 1996 Agreements, Mars and MEI agreed that Mars was the owner of the
patents-in-suit:

> [Mars] Incorporated currently owns . . . a substantial number of patents
> and patent applications, which existed at 31 December 1995, relating to
> Covered Products [defined as "currency note acceptors and coin
> exchange mechanisms and other electronics products"] manufactured and
> sold by MEI-UK ("Covered Intellectual Property") . . . .

J.A. 4944. In the same document, Mars made clear that MEI-UK—a separate corporate
entity from either Mars or MEI—previously had and would continue to have a license to
practice the patents-in-suit:

> MEI-UK will continue to have a non-exclusive right to exploit, in the
> conduct of its business, the Covered Intellectual Property in any country of
> the world in exchange for a royalty payable to Incorporated . . . .

<u>Id.</u> Thus, prior to 1996, MEI-UK had a license: the right to practice the patents-in-suit
"in any country of the world" (including the United States), in exchange for a royalty
payment. MEI cannot have been Mars's exclusive United States licensee, when the
terms of the 1996 Agreements make clear that Mars had allowed MEI-UK to practice

the patents in the United States. The deposition testimony of Mars's Corporate Tax Director confirmed MEI-UK's rights under its license from Mars. See J.A. 4130 ("Q. Were there instances where MEI-U.K. could make a product such as a coin changer and import that product into the United States for delivery to MEI, Inc.? A. That could happen, sure.").

MEI was not, therefore, the exclusive licensee to the patents-in-suit in the United States prior to 1996. It consequently lacked constitutional standing. See, e.g., Poly-America, 383 F.3d at 1311 ("[The licensee] does not have exclusive rights. It is clearly identified in the license agreement as a non-exclusive licensee, and as such, it received only a 'bare license' and has no entitlement under the patent statutes to itself collect lost profits damages for any losses it incurred due to infringement."); Rite-Hite, 56 F.3d at 1553 ("Most particularly, the [licensees] had no right under the agreements to exclude anyone from making, using, or selling the claimed invention. The [licensees] could not exclude from their respective territories other [licensees], third parties, or even [the patentee] itself."). Because we find that MEI was not an exclusive licensee as a result of Mars's license to MEI-UK, we need not consider the effect of the other licenses identified by Coinco or the district court. See Mars, 2006 WL 2927239, at *3-4.

### C. Mars's Standing (1996-2003)

The district court held that the 1996 Agreements transferred ownership of the '719 patent[1] to MEI and therefore deprived Mars of standing to recover damages on sales from 1996 to 2003. Mars, 2006 WL 2927240, at *8. However, applying the logic of this court's decision in Schreiber Foods, the district court held that Mars could cure its

---

[1]     The '137 patent expired prior to 1996. Mars, 2006 WL 2927240, at *6. Only the '719 patent is at issue in the 1996-2003 timeframe.

lack of standing "by the 'imminent' transfer back to Mars of the rights to the . . . '719 patent[] before final judgment." Id. Though the record is not clear on this point, it appears that the district court treated the Confirmation Agreement as satisfying Schreiber Foods by transferring all of the rights in the '719 patent back to Mars prior to final judgment, thus restoring Mars's standing to recover damages from 1996 to 2003. The district court thus applied its royalty rate to a base that included Coinco sales both prior to 1996, and from 1996 to 2003.

On appeal, Coinco argues that Mars failed to recover standing because:  (1) the Confirmation Agreement transferred only the right to sue—not title to—the '719 patent; and (2) the transfer was after final judgment.  Our review of this question of standing is de novo.  See Rite-Hite, 56 F.3d at 1551.

Preliminarily, we note that both parties have confused the record by taking positions here that are seemingly contradictory to positions taken before the district court as to the interpretation and effect of the Confirmation Agreement.   When addressing MEI's standing at the district court, Coinco argued that the Confirmation Agreement transferred back to Mars all of MEI's rights, presumably including title. See J.A. 3242 ("The 2006 Coinco Confirmation Agreement . . . purports to transfer MEI's entire rights to damages for infringement in the '719 Patent, including damages for past infringement, to Mars, Incorporated."); J.A. 3913 ("From the four corners of that particular document, it is clear to Coinco and we believe should be clear to the court that whatever rights that MEI had with respect to the '719 patent, at least according to that document, have been transferred to Mars, Inc.").  Now, Coinco argues that the Confirmation Agreement did not transfer title back to Mars. See Cross Appellant's Br.

30 ("Mars did not have standing to assert the '719 Patent after January 1, 1996, because—unlike Schreiber Foods—Mars never regained title to the patent.").

Mars is equally guilty of changing positions. At the district court and in some sections of its opening brief here, Mars argued that the Confirmation Agreement transferred "ownership" (presumably meaning title) from MEI to Mars. See Appellant's Br. 15 ("Mars sold MEI as of June 19, 2006 and regained full ownership of the '137 and '719 patents, including the right to sue for past infringement.") But at oral argument, Mars claimed that the Confirmation Agreement did not and could not transfer title, because Mars never gave up title in the first place. Oral Arg. at 13:52-14:12, available at http://www.cafc.uscourts.gov/oralarguments/mp3/2007-1409.mp3 ("The Confirmation Agreement does not transfer title . . . ."). Because this is a question of standing and our review is de novo, see Rite-Hite, 56 F.3d at 1551, we will independently evaluate the effect of the 1996 Agreements and the Confirmation Agreement on the ownership of the '719 patent, notwithstanding the apparently contradictory representations of both parties.

"[T]he plaintiff in an [infringement] action . . . must be the person or persons in whom the legal title to the patent resided at the time of the infringement." Crown Die & Tool Co. v. Nye Tool & Mach. Works, 261 U.S. 24, 40 (1923) (quoting 3 Robinson on Patents § 937); Rite-Hite, 56 F.3d at 1551 ("Generally, one seeking money damages for patent infringement must have held legal title to the patent at the time of the infringement.") Likewise, the procedure described in Schreiber requires a patentee to reacquire title to a patent to correct the jurisdictional defect that arises when the plaintiff loses title to the patent during the litigation. See Schreiber, 402 F.3d at 1204 ("Here

Schreiber reacquired its stake in the litigation by reacquiring the '860 patent (and causes of action thereunder) before the entry of judgment. The jurisdictional defect that had existed was cured before the entry of judgment and thus the judgment was not void." (emphasis added)). We must therefore determine whether the 1996 Agreements transferred title of the '719 patent from Mars to MEI, and, if so, whether the Confirmation Agreement transferred title back from MEI to Mars.

Construction of patent assignment agreements is a matter of state contract law. Minco, 95 F.3d at 1117. By their terms, the 1996 Agreements are governed by Delaware law. In Delaware:

> Under standard rules of contract interpretation, a court must determine the intent of the parties from the language of the contract. A determination of that kind will sometimes require the court to decide whether or not the disputed contract language is ambiguous. Contract language is ambiguous if it is reasonably susceptible of two or more interpretations or may have two or more different meanings. Where no ambiguity exists, the contract will be interpreted according to the ordinary and usual meaning of its terms.

Twin City Fire Ins. Co. v. Del. Racing Ass'n, 840 A.2d 624, 628 (Del. 2003) (footnotes and internal quotation marks omitted).

The relevant language of the 1996 Agreements is: "[Mars] Incorporated hereby transfers to MEI-US its entire interest in the Covered Intellectual Property that relates to the business of the Parties." J.A. 4942. We see nothing ambiguous about this language. A transfer of the "entire interest" of a patentee in a patent is well known to mean a full assignment of the patent—i.e., transfer of title. See, e.g., Littlefield v. Perry, 88 U.S. 205, 219 (1874) ("[The] power of assignment has been so construed by the courts as to confine it to the transfer of an entire patent, an undivided part thereof, or the entire interest of the patentee or undivided part thereof within and throughout a certain

specified portion of the United States.  One holding such an assignment is an assignee within the meaning of the statute, and may prosecute in the Circuit Court any action that may be necessary for the protection of his rights under the patent." (emphasis added)). Thus, giving the ordinary and usual meaning to the terms of this clause of the 1996 Agreements, we find that intent of the parties was to transfer title to the '719 patent from Mars to MEI.  Like the district court, we therefore conclude that Mars lacked standing as of 1996.  Mars, 2006 WL 2927240, at *8.

We next turn to the Confirmation Agreement to determine whether it transferred title to the '719 patent back to Mars.[2]  The Confirmation Agreement is governed by New York law.  In New York, "[t]he words and phrases used by the parties must, as in all cases involving contract interpretation, be given their plain meaning . . . ."  Brooke Group Ltd. v. JCH Syndicate, 663 N.E.2d 635, 638 (N.Y. 1996).  Moreover, "it is common practice for the courts [of New York] to refer to the dictionary to determine the plain and ordinary meaning of words to a contract."  Mazzola v. County of Suffolk, 533 N.Y.S.2d 297, 297 (N.Y. App. Div. 1988).

Mars cites paragraph A of the recitals as the portion of the agreement effecting a transfer of rights, but paragraph A contains nothing but a general description of the subject matter of the purchase agreement.  Paragraph 1 appears to be the paragraph that most closely resembles a transfer of title.  It states:

> Mars and the Buyer [MEI] do hereby acknowledge that Mars owns and
> retains the right to sue for past infringement of the Litigation Patents.  To
> the extent that MEI may have or claim any rights in or to any past

---

[2]      Though the Confirmation Agreement refers to a purchase agreement between Mars and its subsidiaries, the purchase agreement was not made part of the record either before the district court or before us.  The only evidence that Mars cites for any transfer of rights from MEI to Mars in 2006 is the Confirmation Agreement itself.

> infringement of the Litigation Patents or any recovery therefor, upon the terms and subject to the conditions of the Purchase Agreement, MEI hereby does irrevocably assign all such rights to Mars.

J.A. 3177-78 (emphases added).

The first sentence of paragraph 1 describes an acknowledgement—i.e., a recognition—of rights that the contracting parties believed had already been transferred. See, e.g., 1 Oxford English Dictionary 108 (2d ed. 1989) (defining "acknowledge" as "1. To own the knowledge of; to confess; to recognize or admit as true. . . . 3. To own as genuine, or of legal force or validity; to own, avow, or assent, in legal form, to (an act, document, etc.) so as to give it validity"); Webster's Third New International Dictionary of the English Language, Unabridged 17 (2002) (defining "acknowledge" as "1 : to show by word or act that one has knowledge of and agrees to (a fact or truth) . . . 2 a : to show by word or act that one has knowledge of and respect for the rights, claims, authority or status of . . . : recognize, honor, or respect esp. publicly"). It did not purport to be a transfer itself.[3]

The second sentence of paragraph 1 does describe an actual transfer—"MEI hereby does irrevocably assign all such rights to Mars." J.A. 3178. But the antecedent of "such rights" is "any rights in or to any past infringement of the Litigation Patents or any recovery therefor." J.A. 3177-78. This is an assignment of the right to sue for past infringement, not an assignment of title. See Morrow, 499 F.3d at 1342 (holding that

---

[3] In fact, the title of the Confirmation Agreement—"COINCO CONFIRMATION AGREEMENT"—itself suggests that the agreement was meant primarily to acknowledge an understanding of an earlier agreement, rather than to transfer ownership of property. J.A. 3177. See, e.g., 3 Oxford English Dictionary 710 (2d ed. 1989) (defining "confirmation" as "1. The action of making firm or sure . . . . 2. The action of confirming or ratifying by some additional legal form"); id. at 709 (defining "confirm" as "2. To make valid by formal authoritative assent (a thing already instituted or ordained); to ratify, sanction").

transfer of right to sue for past infringement does not convey title or standing in infringement action). The 1996 Agreements make clear that MEI and Mars knew how to transfer title when they intended to do so. We see no provision in the Confirmation Agreement that transfers title to the '719 patent back to Mars.

Finally, we reject Mars's argument that because the right to sue for past infringement is the "only remaining right[]" in an expired patent, a transfer of the right to sue is effectively the same as a transfer of title. Appellant's Reply Br. 15. Title to a patent—even an expired patent—includes more than merely the right to recover damages for past infringement. Moreover, the transfer of the right to sue for past infringement divorced from title creates a risk of unnecessary third-party litigation, whether or not the patent has expired. See Crown Die, 261 U.S. at 39 (expressing disfavor toward separate transfer of right to sue, because it would "stir up litigation by third persons that is certainly contrary to the purpose and spirit of the statutory provisions for the assigning of patents").

We conclude that the Confirmation Agreement did not transfer title and that Mars lacks standing for the period from 1996 to 2003.[4] We therefore need not decide whether the Confirmation Agreement took effect before or after final judgment for purposes of Schreiber.

### D. Reasonable Royalty

After a four-day damages trial, the district court determined that a reasonable royalty was a blended royalty rate of 7% for both patents. The district court weighed the

---

[4] Neither the parties to this appeal nor MEI have challenged the district court's determination that MEI lacks standing for the period between 1996 and 2003. We do not address that issue here.

Georgia-Pacific factors and issued a forty-six page oral opinion explaining its rationale in arriving at the 7% rate.

Coinco principally challenges three aspects of the district court's analysis. First, Coinco argues that the district court erred by awarding a reasonable royalty rate higher than the cost to Coinco of implementing acceptable noninfringing alternatives. Second, Coinco argues that the reasonable royalty rate could not exceed 4%, in light of Mars's representations to Inland Revenue. Finally, Coinco claims that the district court erred by relying on Coinco's incremental profit, rather than its operating profit, to calculate a reasonable royalty.

"In reviewing damages awards in patent cases, we give broad deference to the conclusions reached by the finder of fact." Monsanto Co. v. McFarling, 488 F.3d 973, 981 (Fed. Cir. 2007). We review a district court's damages decision for "an erroneous conclusion of law, clearly erroneous factual findings, or a clear error of judgment amounting to an abuse of discretion." Rite–Hite, 56 F.3d at 1543-44. More particularly, in a reasonable royalty calculation, we review "the methodology (i.e., accounting method) for damages for an abuse of discretion and the damage amount for clear error." Micro Chem., 318 F.3d at 1122 (citing SmithKline Diagnostics, Inc. v. Helena Labs. Corp., 926 F.2d 1161, 1164 n.2 (Fed. Cir. 1991)).

### 1. Noninfringing Alternatives

The heart of Coinco's first argument is that an infringer should not be required to pay more in reasonable royalty damages than it would have paid to avoid infringement in the first place by switching to an available noninfringing alternative. This claim fails for two reasons. First, Coinco is simply wrong to suggest that the district court found that there were available, acceptable, noninfringing alternatives. What the district court

found was that "Coinco had the ability, the resources, and the desire to design around Mars' patents," that "it could probably figure out a way to avoid infringement," but that the available "design around was not as good as it would like." J.A. 125, 128, 130. There was, therefore, no available and acceptable noninfringing alternative to which Coinco could have switched at the time of the hypothetical negotiation; there was merely the possibility that it could have come up with one.

Second, even if Coinco had shown that it had an acceptable noninfringing alternative at the time of the hypothetical negotiation, Coinco is wrong as a matter of law to claim that reasonable royalty damages are capped at the cost of implementing the cheapest available, acceptable, noninfringing alternative. We have previously considered and rejected such an argument. See Montsanto Co. v. Ralph, 382 F.3d 1374, 1383 (Fed. Cir. 2004) (rejecting infringer's argument that "a reasonable royalty deduced through a hypothetical negotiation process can never be set so high that no rational self-interested wealth-maximizing infringer acting ex ante would ever have agreed to it"). To the contrary, an infringer may be liable for damages, including reasonable royalty damages, that exceed the amount that the infringer could have paid to avoid infringement.

The district court considered the potential availability of noninfringing alternatives, found that Coinco did not have—but probably could have designed—an acceptable alternative, and reduced the blended royalty rate accordingly, from 11.5% to 7%. Using a calculation methodology that did not limit Mars's damages to the cost of its least expensive noninfringing alternative was not an abuse of discretion, and the resulting 7% royalty rate was not clearly erroneous.

## 2.  Representation to Inland Revenue

Next, Coinco argues that the district court erred by ignoring Mars's purported admission that a royalty over 4% was excessive.  The 1996 Agreements between Mars and its subsidiaries include a clause that states:

> For the years 1990-1995, the parties agree that the historical royalty payment with respect to the Covered Intellectual Property was excessive to the extent it exceeded a net royalty of 4% after taking into account product development recovery . . . .

J.A. 4945.  Coinco argues that this clause indicates Mars's belief that any royalty rate for all of Mars's patents (including the patents-in-suit) would be "excessive" if it were above 4%.  The district court found that the 4% rate was only minimally relevant for two reasons:  (1) because it was the result of negotiations with United Kingdom taxing authorities, "not an arm's length transaction"; and (2) because "[i]t is certainly not a license between competitors, as the license in the hypothetical negotiation between Mars and Coinco would be."  J.A. 123.

We see no error.  The district court was plainly correct to conclude that the terms in an intra-company license agreement made to satisfy the requirements of the United Kingdom taxing authorities are likely to be very different from those resulting from a hypothetical negotiation between competitors.  While Coinco may be correct that the United Kingdom taxing authorities requested that the license rate be one that simulates the rate that would have been reached in an arm's-length negotiation between independent enterprises, there is no evidence that suggested that the 4% rate would have been the rate at which Mars would have licensed a competitor.  See J.A. 129-30 (district court reasoning that "it would be economically suicidal" for Mars to license the competitor of its subsidiary).  Thus, the district court did not abuse its discretion by

refusing to cap the reasonable royalty rate at the 4% rate referred to in the 1996 Agreements.

### 3. Incremental Profits

The district court found that the market for coin changers was "very profitable." J.A. 123. In reaching this conclusion, the district court relied on the incremental profit—rather than operating profit—of both Mars and Coinco. Coinco argues that this was error.

We disagree. We have never held that any one profit accounting methodology is appropriate in all industries, for all companies, in all cases. The selection of the appropriate method of profit accounting in the circumstances is properly left to the broad discretion of the district court. Here, the district court heard competing expert testimony and found that a profitability analysis based on incremental profits was appropriate. We defer to that finding. See, e.g., Monsanto, 488 F.3d at 981.

Moreover, we reject Coinco's argument that a reasonable royalty can never result in an infringer operating at a loss. "[A]lthough an infringer's anticipated profit from use of the patented invention is '[a]mong the factors to be considered in determining' a reasonable royalty, see Georgia-Pacific, 318 F. Supp. at 1120, the law does not require that an infringer be permitted to make a profit." Montsanto, 382 F.3d at 1384. See also State Indus., Inc. v. Mor-Flo Indus., Inc., 883 F.2d 1573, 1580 (Fed. Cir. 1989) ("There is no rule that a royalty be no higher than the infringer's net profit margin.").

* * *

We have considered Coinco's other arguments challenging the 7% royalty rate. Each of its other arguments concerns the weight that the district court gave to specific facts. We decline Coinco's inappropriate invitation to reweigh the damages evidence.

Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1461 (Fed. Cir. 1998) (en banc) ("[W]e conclude that the district court weighed the evidence before it in an appropriate fashion. We decline [the cross appellant's] inappropriate invitation that we essentially reweigh the record evidence.").

Accordingly, we affirm the district court's assessment of a 7% reasonable royalty rate. Because Mars's lack of standing for the period from 1996 to 2003 changes the royalty base, we must remand for recalculation of damages using the 7% rate.

### III. CONCLUSION

For the foregoing reasons, we affirm the district court's summary judgment excluding Mars's lost profits claim. Because MEI lacked standing prior to 1996, we affirm the district court's denial of Mars's motion for leave to amend. However, we reverse the district court's determination that Mars had standing to recover damages for the period from 1996 to 2003. We affirm the district court's assessment of a 7% reasonable royalty rate, and we remand for recalculation of damages for the period prior to 1996 and for further proceedings consistent with this opinion.

### AFFIRMED-IN-PART, REVERSED-IN-PART, AND REMANDED.

### COSTS

Each party shall bear its own costs.

CERTIFIED COPY
I HEREBY CERTIFY THIS DOCUMENT
IS A TRUE AND CORRECT COPY
OF THE ORIGINAL ON FILE.

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

By: _____ Date: 7/7/08